# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | On Appeal From<br>Bk. Case No. 06-19626 |
| Kara Homes, Inc. | |
| | |
| MADISON CROSSING AT<br>BIRCH HILL CONDOMINIUM<br>ASSOCIATION, INC., | Civil Action No. 17-3981-BRM |
| | **OPINION** |
| Appellant, | |
| v. | |
| MADISON CROSSING AT<br>BIRCH HILL, LCC, | |
| Appellee. | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Appellant Madison Crossing at Birch Hill Condominium Association, Inc.'s ("Appellant" or "Association") appeal from the United States Bankruptcy Court's order denying the Association's Motion for a determination that its construction defect claims against Respondent Madison Crossing at Birch Hill, LLC ("Respondent") are not barred by the Kara Homes, Inc. confirmed Chapter 11 bankruptcy plan.[1] (ECF No. 6.)[2] Respondent opposed (ECF No. 13) and the Association replied (ECF No. 20). As a party of interest, the Community

---

[1] Specifically, the Association's Motion was for a Determination that its Claims are not Barred by Discharge, Injunction, Release or Orders Entered pursuant to 28 U.S.C. § 1141. (ECF No. 6 at 5.) Pursuant to this Motion, the Association sought to assert an underlying claim to hold Respondent, a developer, liable for common element construction defects. (*Id.* at 2.)

[2] All ECF Docket Numbers refer to the District of New Jersey docket unless otherwise stated.

Associations Institution ("CAI") moved for leave to file a brief as *amicus curiae*. (ECF No. 10-1.) The Court granted the motion (ECF No. 18) and CAI filed its *amicus* brief (ECF No. 10-5). The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158. Pursuant to Federal Rules of Civil Procedure 78(a), oral arguments were held on February 15, 2018. For the reasons set forth below, Appellant's appeal is **DENIED** and the Order of the Bankruptcy Court is **AFFIRMED**.

**I.     BACKGROUND & PARTIES**

   **A.     Appellant – The Association and the Condominium Unit Owners**

The Association is a non-profit corporation comprised of condominium unit owners, organized as a fifty and older age restricted residential area in Old Bridge, New Jersey. (Appellant Br. (ECF No. 6) at 8.) The Association is governed by a five-member executive board. (*Id.*) Unit owners automatically become members of the Association when they take title of their unit. (*Id.* at 8-9.)

   **B.     Debtor – Kara Homes, Inc. and Horizons at Birch Hill, LLC**

Kara Homes, Inc. is the parent company of Horizons at Birch Hill, LLC ("Horizons"). Horizons is the original developer and sponsor of the residential area's condominium development project (the "Development Project").[3] (*Id.* at 9-10.) In the early years of the Development Project, Horizons operated and controlled the Association. (*Id.* at 10.) On April 26, 2006, the Association's executive board was composed of three members—two developer representatives appointed by Horizons and Frank Ramson, an elected unit owner. (*Id.*)

---

[3] The Development Project consisted of 228 residential units, a clubhouse, a fitness room, several special purpose and utility rooms, an outdoor heated swimming pool, bocce courts, private roadways, common parking areas and driveways, walkways, walking trails, exercise stations and a gazebo. (ECF No. 6 at 9.)

### C. 2007 Kara Homes, Inc. Bankruptcy Proceeding

On October 5, 2006, Horizons and its parent company, Kara Homes, Inc., filed for Chapter 11 bankruptcy proceedings. (*Id.* at 9-10.) The Association was one of Horizons largest unsecured creditors. (Resp't Br. (ECF No. 13) at 7.) On February 21, 2007, the Chief Restructuring Officer in connection with the bankruptcy advised Horizons by letter to appoint two unit owners to temporarily occupy the developer's seats on the Association's executive board.[4] (ECF No. 6 at 10.)

On February 7, 2007, the Association retained counsel. (ECF No. 13 at 8.) Through counsel and its three member unit owner-controlled executive board, the Association participated in the bankruptcy proceeding. (*Id.* at 9.) In May 2007, the Association hired the Falcon Group, an engineering firm, to perform a non-invasive inspection of several units. (*Id.*) The engineering firm noted findings of water damage and advised the Association "if there are reports of interior leaks, the Falcon Group would recommend further inspections; roof flashing, waterproofing, and ventilation and arch top window leak testing." (*Id.* at 10.)

On September 24, 2007, in an order pursuant to 11 U.S.C. § 363, the Bankruptcy Court authorized the sale of the Development Project from Horizons to Respondent, the successor developer, free and clear of all liens and claims ("Sale Order").[5] (ECF No. 6 at 11; ECF No. 13 at 11.) On September 26, 2007, the Bankruptcy Court confirmed the Kara Homes, Inc. Chapter 11

---

[4] The letter specified: "The appointment of any Owners to the Developer positions on a Board is made with the express understanding that such appointment is temporary, and any such appointment may be revoked at any time, with or without cause, upon written notice." (ECF No. 6 at 10.)

[5] The Sale Order discharge of any and all claims related to the property, including "product liability, defective workmanship, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims . . . whether arising prior to, on, or subsequent to the Petition Date." (ECF No. 13 at 13.)

bankruptcy plan. (ECF No. 6 at 11.) On September 29, 2007, the Association's unit owner-controlled executive board sent a memorandum to the other members of the Association, stating, in relevant part: "[Respondent] is not subject to or for any liability of [Kara Homes, Inc.] regarding the closed homes. Those matters must be handled through the HOA Board and warranty company as we have been doing." (ECF No. 13 at 14.)

### D. Respondent – The Successor Developer

Respondent is the successor developer and sponsor of the Development Project following Horizons' confirmed bankruptcy. (*Id*. at 12.) Respondent took title of one hundred fully or partially constructed units.[6] (*Id*. at 10-11.) On January 31, 2008, Respondent removed the two temporary unit owners from the Association's executive board and appointed two developer representatives. (*Id.* at 12.) By December 31, 2008, construction of 173 units was completed. (*Id.* at 11.) By December 31, 2010, Respondent scheduled for construction an additional fifty-five units to be completed. (*Id*. at 12.)

### E. 2013 Transition Period of the Association's Executive Board

The "transition period" refers to when the developer begins to surrender majority control of the Association's executive board to unit owners elected by the Association's members as units in the condominium development project are sold. (*Id*. at 12-13.) Under the Planned Real Estate Development Full Disclosure Act ("PREDFDA") and the New Jersey Condominium Act:

> When unit owners other than the developer own 25% or more of the units in a condominium that will be operated ultimately by an association, the unit owners other than the developer shall be entitled to elect not less than 25% of the members of the governing board or other form of administration of the association. Unit

---

[6] According to the Association, prior to the 2007 Kara Homes, Inc. confirmed bankruptcy plan, Horizons had sold seventy-three units to individual owners. (ECF No. 6 at 10.) There is a minor deviation according to Respondent, however, claiming seventy-four units had been sold and closed with forty-five units under contract and 109 units remained unsold. (ECF No. 13 at 6-7.)

> owners other than the developer shall be entitled to elect not less than 40% of the members of the governing board or other form of administration upon conveyance of 50% of the units in a condominium. Unit owners other than the developer shall be entitled to elect all of the members of the governing board or other form of administration upon the conveyance of 75% of the units in a condominium. However, when some of the units of a condominium have been conveyed to purchasers and none of the others are being constructed or offered for sale by the developer in the ordinary course of business, the unit owners other than the developer shall be entitled to elect all of the members of the governing board . . . .

N.J.S.A. § 46:8B-12(a).

On January 13, 2011, after Respondent sold 50% of the units, the Association's executive board expanded to five total members, two elected unit owners and three appointed developer representatives. (ECF No. 6 at 14.) On June 20, 2013, after Respondent sold 75% of the units, an election was held to pass four board member seats and majority control of the Association's executive board to the unit owners. (*Id*.) A developer representative was appointed to the fifth seat. (*Id*.) Following the transition, the Association sought to investigate the condominium building's exterior cladding and roofing system, among other component parts. (*Id*.) A preliminary investigation revealed signs of improper design and common element construction defects. (*Id*.)

### F. 2014 State Litigation

On April 21, 2014, the Association filed a complaint in the Superior Court of New Jersey against Horizons, the original developer, and Respondent, the successor developer. (*Id*. at 15.) The Association sought to hold the developers liable for the condominium's construction defects. (*Id.*) However, because construction and sale of the units at the time the complaint was filed was ongoing, the Association entered into a twenty-four-month tolling agreement with Respondent to temporarily dismiss its construction defect claims against Respondent, without prejudice. (*Id.*) On

5

October 14, 2014, the Association filed its first amended complaint, removing Respondent from the state action. (*Id.*)

### G. Association's Motion in Bankruptcy Court

On September 3, 2015, the Association moved for a determination that its construction defect claims are not barred by the 2007 Kara Homes, Inc. confirmed Chapter 11 bankruptcy plan. (*Id*. at 16.) The Association sought to hold Respondent liable for the condominium building's common element construction defects. (*Id.*) On November 2, 2015, a hearing was held before the Honorable Michael B. Kaplan, U.S.B.J., supplemental responses by the Association were filed on November 16, 2015, and a second hearing was held on December 10, 2015. (*Id*. at 16-17.)

On January 19, 2016, the Bankruptcy Court entered a preliminary opinion on the Association's Motion (the "Preliminary Opinion"). The Preliminary Opinion held, in relevant part:

> [T]he Court cannot determine whether any Board member, particularly [a unit owner] who was a board member during most, if not all, of the relevant pre-confirmation time period, discovered any of the construction defects prior to confirmation. On this record, the Court does not believe it has sufficient information to make such a determination, as there is currently a lack of specificity regarding these defects.

(*Id*. at 17-18.)

On March 7, 2016, Judge Kaplan held a conference call on the record to clarify the Preliminary Opinion, stating, in relevant part:

> Now for the reasons this Court has explained previously, because this Court must apply *Frenville*, the Association had no claim in this case, at the time of the sale, unless it could be established that the Association had discovered the defect, or should have discovered the defect. And that was going to be the point for continuing discovery. And that's why we set up a process in which the parties either agree that they would not undertake continuing discovery or limit the discovery.

(*Id.* at 21.) In light of the Preliminary Opinion, both Parties continued with additional limited discovery[7] to establish whether the Association's claims accrued prior to the 2007 Kara Homes, Inc. Chapter 11 bankruptcy plan and "whether any of the Board members were aware of the construction defects prior to confirmation." (ECF No. 13 at 16; Appellant's Reply Br. (ECF No. 20) at 21.)

### H. Bankruptcy Court's Final Ruling on the Association's Motion

On April 27, 2017, the Bankruptcy Court entered its final ruling on the motion, finding:

> [T]he fact that the Association's statute of limitations may have been tolled until after the 2013 board transition when it became wholly unit-owned has no bearing on when the Association's claim first accrued. The relevant inquiry for accrual purposes is still focused on when the Association knew or should have known of the injury. . . . Based on the evidence presented . . . the Association was aware of the injury, i.e., the construction defects prior to September 26, 2007 [the date of the Confirmation Plan].

(ECF No. 6 at 23.) On May 16, 2017, the order denying the Association's Motion was entered. (*Id.* at 24.) On May 30, 2017, the Association filed an appeal with this Court. (*Id.*)

## II. THE CAI'S AMICUS BRIEF

The CAI is a national organization with 35,000 members, aiming to educate and advocate for the 342,000 community associations across America. (CAI's Br. as *Amicus Curiae* (ECF No. 10) at 2.) The CAI takes the position the Bankruptcy Court erred in finding the Association's construction defect claims accrued after the Chief Restructuring Officer appointed two unit owners to occupy the Debtor's board seats temporarily. (*Id*. at 3.)

---

[7] Depositions were taken of former board members Frank Ramson, Josepha Silverstein, and Alan Ross, and of president of the management company for the Development Project since 2005, Michael Pesce. (ECF No. 6 at 22.)

7

The CAI articulates three principles as they relate to this appeal. First, the CAI cites to the statutory transition process under the New Jersey Condominium Act and PREDFDA. (*Id.* at 4.) Specifically, the CAI argues that, under the New Jersey Condominium Act, the transition period does not occur until 75% of the units are sold. (*Id*. at 5-6.) PREDFDA promulgates a similar provision and adds a developer may surrender control of the executive board before 75% of the units are sold if the unit owners consent to the transfer through a majority vote. (*Id*. at 6.) Accordingly, the transition period occurs when: (1) a developer sells 75% of the condominium units and the unit owners elect members of the association to assume control; or (2) the owners agree to assume control prior to the 75% sale of the condominium units through a majority vote. (*Id.* at 4.)

Second, the CAI contends, under New Jersey law, claims by a condominium association do not accrue until transition occurs. (*Id.* at 7.) Therefore, the "right to institute and maintain a suit" does not accrue until control of the association's executive board passes from the developer to the unit owners. (*Id*. at 7-8.) Following transition, condominium associations are afforded a six-year statute of limitation to raise its construction defect claims. (*Id*. at 4.) According to the CAI, whether the unit owners knew or should have known of the construction defects prior to transition is immaterial because even if they had the requisite knowledge, the unit owners could not assert their claims while the developer retained control of the Association. (*Id.* at 10-11.)

Here, the CAI argues the Association did not have the right to institute and maintain a suit even when the Chief Restructuring Officer replaced the developer representatives from the executive board with two unit owners because the Association's members did not elect the unit owners. (*Id.* at 9.) According to the CAI, the Chief Restructuring Officer's actions could not have

8

triggered transition because no vote was held for the unit owners to consent for control of the board to be transferred away from the developers. (*Id.*)

The CAI also "warns" of several implications in assuming transition occurred when the Chief Restructuring Officer temporarily appointed two unit owners to the Association's executive board. (*Id.* at 10.) If the Association raised its claim against the Debtor through its three member executive board, once the successor developer took charge of the Development Project and, thus control over the Association, the successor developer could dismiss the action and bar the Association from raising their claim again. (*Id.*)

Third, the CAI explains how condominium associations differ from typical corporations. (*Id.* at 11.) According to CAI, a condominium association is comprised of two separate and distinct lives; the first controlled by the developers and the second controlled by unit owner elected board members. Conversely, the Bankruptcy Court held the discovery rule—when the Association knew or should have known of the construction defects—governs accrual of the cause of action, the CAI contends accrual and commencement of the statute of limitation do not occur until a unit owner majority elected board takes control of the Association. (*Id*. at 11-12.) The primary right to pursue a condominium's common element defect claim lies with the Association. (*Id.* at 12.) Hence, the unit owners were not authorized to pursue their claim until they controlled the Association. (*Id*.) Accordingly, the CAI contends the Bankruptcy Court erred in holding the cause of action accrued while the Association remained in control of the developers. (*Id.* at 15.)

### III. APPELLATE JURISDICTION

Pursuant to Title 28 of the United States Code, Section 158(a), "[t]he district courts of the United States shall have jurisdiction to hear appeals" from "final judgments, orders, and decrees" of a bankruptcy court. 28 U.S.C. § 158(a)(1). The Bankruptcy Court's Order Denying a

Determination that Claims are not Barred by Discharge, Injunction, Release or Orders Entered is a final order for purposes of an appeal. *In re Nickels Midway Pier, LLC*, 255 F. App'x 633, 636 n.4 (3d Cir. 2007).

IV. **LEGAL STANDARD**

"The proper standard of review to be applied by a district court when reviewing a ruling of a bankruptcy court is determined by the nature of the issues presented on appeal." *In re Beers*, No. 09-1666, 2009 WL 4282270, *3 (D.N.J. Nov. 30, 2009) (quoting *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005)). A district court reviews "the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005) (quoting *Interface Group-Nevada v. TWA (In re TWA)*, 145 F.3d 124, 130-31 (3d Cir. 1998)).

Here, the Association raises the three following issues on appeal:

> (1) whether the Bankruptcy Court erred in ruling that Association had the authority and capacity to initiate an action under applicable state law prior to the state law transition period which did not occur until 2013 and, therefore, its claims accrued before the 2007 confirmation of the Debtor's plan and was discharged;
>
> (2) whether the Bankruptcy Court erred in failing to determine that the applicable statute of limitations did not begin to run until the transition period commenced in 2013;
>
> (3) whether the Bankruptcy Court erred in ruling that the Association had knowledge of the construction defects prior to 2007 so that the Association's cause of action accrued prior to the confirmation of Debtor's plan and, therefore, the Association's successor liability claims are barred.

(ECF No. 6 at 7.) To address these issues, the Court must examine the following.

10

First, the Court must determine whether accrual of the Association's claim was triggered prior to the 2007 confirmed bankruptcy plan. In reviewing the Bankruptcy Court's legal determination, a plenary standard of review applies. *See In re Handel*, 570 F.3d 140, 141 (3d Cir. 2009); *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Second, the Court must determine whether the Association knew or should have known of the construction defects prior to the 2007 confirmed bankruptcy plan. In reviewing the Bankruptcy Court's factual determination, a clearly erroneous standard of review applies. *In re United Healthcare Sys., Inc.*, 396 F.3d at 249. Finally, the Court must determine whether the Association had the authority and capacity to initiate a state law action before the 2013 transition period. Again, in reviewing the Bankruptcy Court's legal determination, a plenary standard of review applies. *See In re Handel*, 570 F.3d at 141; *Commander v. LoGuidice (In re LoGiudice)*, No. 13-2612, 2013 WL 6528810, at *2 (D.N.J. Dec. 12, 2013). The Court addresses each in turn.

V. **DECISION**

    A. **Whether the Bankruptcy Court Erred in Ruling the Successor Liability Claims Are Barred Because the Association Knew of the Construction Defect Prior to the Debtor's Confirmation Plan and Failing to Determine that the Applicable Statute of Limitations Did Not Begin to Run Until the Transition Period Commenced in 2013.**

The Association argues the six-year statute of limitations did not begin to run until transition occurred. (ECF No. 6 at 33.) Specifically, the Association argues "the construction defect claims of the Association only accrued when transition commenced in 2013." (*Id.*) Further, the Association argues the Bankruptcy Court erred in ruling the Association had the requisite knowledge of the construction defects prior to the 2007 confirmed bankruptcy plan. (*Id.* at 45.) Respondent argues the Association knew or should have known of the construction defect claims prior to the 2007 confirmed bankruptcy plan, and therefore the Association's claims accrued prior to confirmation and were properly discharged by the Bankruptcy Court. (ECF No. 13 at 33, 39.)

11

Under New Jersey law, two statutes stand as a statutory bar to when a cause of action may be brought in a construction defect case: 1) the statute of repose; and 2) the accrual statute of limitation. *Palisades at Fort Lee Condo. Ass'n, Inc. v. 100 Old Palisade, LLC*, 230 N.J. 427, 453-54 (2017). With respect to the statute of repose, N.J.S.A. § 2A:14-1.1(a), a plaintiff maintains a ten-year limitations period from the date of a project's substantial completion to bring a construction defects claim. *Id.* at 453; *see also Town of Kearny v. Brandt*, 214 N.J. 76, 93 (2013). The legislative intent behind the statute of repose was to provide certainty to when exposure of a defendant's liability would conclude. *Palisades*, 230 N.J. at 453. Indeed, the ten-year repose statute sets the outer limit for a plaintiff to file a construction defects claim. *Id.* By way of example, the New Jersey Supreme Court explained: "[if] a construction-defect action accrues eight years after a project's substantial completion, a plaintiff will only have two years to file a claim before it is barred by the repose statute." *Id.*

Under the accrual statute of limitation, a plaintiff maintains a six-year limitations period from the date the cause of action accrued to bring a construction defects claim. N.J.S.A. § 2A:14-1. To determine when accrual of a cause of action occurred, a court must apply the discovery rule. *Palisades*, 230 N.J. at 447-48. Specifically, "accrual occurs when a plaintiff knows or, through the exercise of reasonable diligence, should know of the basis for a cause of action against an identifiable defendant." *Id.* at 447. Moreover, accrual of the six-year statute of limitations does not reset with every change in ownership of the property. *Id.* at 450. Rather, "[i]f the building's owner knew or reasonably should have known of construction defects at the time of the sale of property, the purchaser takes title subject to the original owner's right—and any limitation on that right—to file a claim." *Id*. at 449-50. In other words, a cause of action "accrues when someone in the chain

of ownership knows or reasonably should know of an actionable claim against an identifiable party." *Id*. at 450.

Significantly, for the purposes of this bankruptcy appeal, discharge of the Association's claims are determined by the accrual test articulated in *Avellino v. M. Frenville Co. (In re Frenville Co.),* 744 F.2d 332 (3d Cir. 1984). The Kara Homes, Inc. bankruptcy was confirmed in 2007, before *JELD-WEN, Inc. v. Van Brunt (In re Grossman)* and *Wright v. Owen Corning (In re Owens Corning)*, were decided in 2010 and 2012, respectively. 607 F.3d 114 (3d Cir. 2010); 679 F.3d 101 (3d Cir. 2012). Consequently, the Association is not afforded the requisite due process under *Grossman* and *Wright*. *Wright*, 679 F.3d at 109. Rather, the *Frenville* accrual test applies to determine whether the Association's "right to payment" arises pre-petition, and therefore is discharged. *In re Frenville*, 744 F.2d at 337-38. Under *Frenville*, a claim exists when a "right to payment" arises under state law. *Id.* at 337. Because a construction defects claim begins to accrue at the time the cause of action arises, the Association's claim begins to accrue at the time the "right to payment" arises. Therefore, to determine when the Association's claim began to accrue, the relevant inquiry is whether the Association knew or should have known of the construction defects prior to confirmation. If the Association's claim accrued, and therefore arose, pre-petition, then the claim is discharged under the bankruptcy code. *Id.* at 337-38.

Here, the Bankruptcy Court correctly ruled the Association's claims accrued before the 2007 confirmed bankruptcy plan, and therefore the Association's construction defects claim is discharged. As an initial matter, the Association misinterprets the holding in *Palisades*, arguing the New Jersey Supreme Court held "claims against the contractors begins to run six years from the later of either substantial completion of the contractor's work or when the 'owner' knows or should have known of the existence of the claim." (ECF No. 20 at 23.) Rather, the New Jersey

13

Supreme Court held the statute of repose—triggered by substantial completion—and the accrual statute of limitations—triggered by the discovery rule—serve as two distinct statutory bars against bringing a claim. *See Palisades,* 230 N.J. at 453 ("We cannot end our analysis without noting the distinction between an accrual statute of limitation and a stature of repose. . . . As discussed, an accrual statute generally has no certain end date, given that the trigger of the limitations period may depend on when a plaintiff discovers the basis for his cause of action. In contrast, a repose statute has fixed beginning and ending dates, thus providing certainty to defendants when their exposure to liability concludes.").[8]

The court finds the Bankruptcy Court's legal findings were correctly reached and applied. First, the Bankruptcy Court correctly determined the date of accrual triggers the statute of limitations to run. (Tr. of Hr'g (Bankr. ECF No. 5563) (April 27, 2017) Tr. 6:11-13, *In re Kara Homes, Inc.*, No. 06-19626, (Bankr. D.N.J. April 27, 2017)); *see also Palisades*, 230 N.J. at 442 ("Accrual of an action is the trigger that commences the statute-of-limitations clock."). Second, the Bankruptcy Court correctly determined the discovery rule applies in the context of construction defect claims. (Bankr. ECF No. 5563 at Tr. 5:15-22); *see also Palisades*, 230 N.J. at 448 ("[T]he discovery rule applies to property-tort lawsuits arising from construction defects."). Third, the Bankruptcy Court correctly applied the discovery rule, finding "the Association's claim is deemed to have accrued when the Association knew or should have known of its injury." (Bankr. ECF No.

---

[8] Even assuming the Association is correct "that the [s]ubject [d]evelopment was not substantially completed until after the conclusion of the chapter 11 case" (ECF No. 20 at 33), because the accrual statute of limitations applies the discovery rule, a determination that the plaintiff knew or should have known of the defects triggers the cause of action to start. *Palisades*, 230 N.J. at 443 ("The trigger point for the start of a cause of action under an accrual statute is when 'the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another.'" (citation omitted)). Thus, "[a]ccrual of an action is the trigger that commences the statute-of-limitations clock." *Id*. at 442.

5563 at Tr. 5:21-22.) Significantly, in reaching these legal conclusions, the Bankruptcy Court correctly determined if the Association's claims accrued prior to the 2007 confirmed bankruptcy plan, then the Association's claim must be discharged under the bankruptcy code. (Bankr. ECF No. 5563 at Tr. 6:7-11); *see also In re Frenville*, 744 F.2d at 337-38.

Furthermore, the Association has not shown that the Bankruptcy Court's factual findings were clearly erroneous. *See Marks v. Strubble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004) (finding the burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal"). Rather, the evidence in the record supports the Bankruptcy Court's determination that the Association knew or should have known of its construction defect action prior to the 2007 confirmed bankruptcy plan. Indeed, the Bankruptcy Court relied on several findings before reaching its conclusion. Specifically, Bankruptcy Court based its conclusion on the following factual findings: (1) numerous e-mails recovered revealing discussions with residents regarding construction, design or material defects related to water infiltration; (2) e-mails from Mr. Ramson, a board member of the Association, acknowledging malfunctioning gutters; (3) deposition testimony from Mr. Ramson conceding that leaks were caused by defective workmanship and defective construction; (4) reports from several residence of water infiltration issues; and (5) existing water damages and design flaws reported by an engineer company to the Association. (Bankr. ECF No. 5563 at Tr. 7:22-9:22.)

Based on those findings, the Bankruptcy Court determined that the Association knew or should have known of the construction defects prior to confirmation. *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir. 1989) (finding a bankruptcy court's factual findings are given conclusive effects unless they are deemed "clearly erroneous"). Therefore, the Bankruptcy Court's factual findings were not clearly erroneous. Accordingly, the Bankruptcy Court correctly

ruled the Association's construction defects claim accrued prior to the 2007 confirmed bankruptcy plan because the Association knew or should have known of the underlying claim, and therefore was properly discharged.[9]

> **B. Whether the Bankruptcy Court Erred in Ruling the Association had the Authority and Capacity to Initiate a State Law Action Before the Transition Period, and, therefore, the Association's Claims Were Discharged Because Accrual Began Before the Debtor's Confirmation Plan.**

The Association argues the Bankruptcy Court erred in ruling the Association had the authority and capacity to initiate its state law action prior to the 2007 confirmation of the Kara Homes, Inc. Chapter 11 bankruptcy plan. (ECF No. 6 at 25.) Specifically, the Association argues it could not maintain a construction defect claim against the developers until transition passed control of the Association's governing board from the developers to the unit owners. (*Id*. at 26.) Respondent, however, argues the Association maintained fair opportunity to protect its own interests during the bankruptcy proceeding. (ECF No. 13 at 22-23.) Specifically, Respondent argues because Association participated in the bankruptcy proceeding through counsel, it could have "preserved [it's] claims in the language of the Sale Order," but failed to do so. (*Id.* at 27-28, 32.) Additionally, Respondent argues transition, under certain circumstances, could occur during pendency of the bankruptcy proceeding. (*Id*.)

Under the New Jersey Condominium Act, N.J.S.A. § 46:8B-1 *et seq.*, a condominium association can, on behalf of the condominium unit owners, file suit against a developer for

---

[9] Further, because accrual began prior to the confirmed bankruptcy, whether the six-year statute of limitation expired is irrelevant. The Bankruptcy Court did not dismiss the Association's construction defects claim because the claims were barred by the statute of limitations, but rather discharged the claims under the confirmed chapter 11 Kara Homes, Inc. bankruptcy plan. (Bankr. ECF No. 5563 at Tr. 2:19-24). Indeed, the Bankruptcy Court discharged the Association's claims because successor liability claims—having accrued prior to confirmation—were barred by the free and clear Sale Order. (*Id.*)

common element defects. *Siller v. Hartz Mountain Ass'n*, 93 N.J. 370, 377 *cert. denied*, 464 U.S. 961 (1983); *see also* N.J.S.A. § 46:8B-16(a) ("An association . . . may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually."). Initially, the developer controls the condominium association "until a specific point in time when the developer relinquishes control to the unit owners." *Port Liberte Homeowners Ass'n v. Sordoni Const. Co.*, 393 N.J. Super. 492, 502 *cert. denied*, 192 N.J. 480 (2007); *Siller*, 93 N.J. at 376. When seventy-five percent of the condominium units are sold, the unit owners are entitled to elect all of the members to the association's governing board, effectively transferring control of the association to the unit owners. N.J.S.A. § 46:8B-12.1a.

Likewise, under the PREDFDA, N.J.S.A. § 45:22A-21 *et seq.*, the developer must organize an association to manage the common elements and facilities of the condominium development. N.J.S.A. § 45:22A-43. The developer surrenders control of the association's governing board after seventy-five percent of the condominium units are conveyed to the unit owners. N.J.S.A § 45:22A-47. "The unique relationship between a condominium association and a developer, created by statute, allows an association to step into the developer's shoes when control is passed to the association." *Port Liberte Homeowners Ass'n*, 393 N.J. Super. at 503.

Here, the Association contends, without control of the governing board, it lacked the authority and capacity to assert its construction defect claim. (ECF No. 6 at 37-38.) Although several cases support the Association's argument, *see, e.g.*, *Terrace Condominium v. Midlantic National Bank*, 268 N.J. Super 488, 503 (Law Div. 1993) (holding the association's right to institute and maintain suit does not arise until owners control the association); *Skyline Condo. Ass'n v. Falkin*, 2001 WL 37066787, at *14-16 (App. Div. Sept. 10, 2001) (finding the unit owners were "prevented from litigating their claim through the Association for several years because by

statute the developer controlled the Association"), in light of the bankruptcy proceeding and facts of this case, the Bankruptcy Court properly found the Association had the authority and capacity to initiate a state law action.

Indeed, in *Poblette v. Towne of Historic Smithville-Comm. Ass'n*, the New Jersey Appellate Court faced and ruled on a similar issue. 355 N.J. Super. 55 (App. Div. 2002). The court found "after a developer has gone bankrupt, but absent any evidence that a 'formal transition' from the developer to the Association as to the duty to maintain the common facilities of the development transition of those duties, as a matter of law, [has] taken place." *Id.* at 65. In *Poblette*, following a heavy storm that flooded areas in the development and caused water damage to the property, residents filed a claim against the association for failing to maintain the detention basin that was part of the drainage system. *Id.* at 60. The association, in turn, filed a suit against the developer, claiming the developer owned the land at the time of the flooding, and therefore, was responsible for the damages. *Id.* The court reasoned, however, upon the developer's bankruptcy, a "*de facto* transfer" of the rights and obligations under the easement provisions to maintain community facilities occurred and the association was liable for the damages. *Id*. at 66; *See also One Hudson Park Condo. Ass'n v. Tarragon Corp.* ("Court finds that a transition should be given effect upon the filing of the [d]efendant's bankruptcy petition or alternatively upon the sale of the final unit in the building, and that all rights and duties related to the storage bins as Limited Common Elements, including their assignment and collection of the accompanying fee, have transferred to the Association.").

Further, in light of the facts in this case, the Court is not persuaded the Association lacked the authority and capacity to protect its own interest. Indeed, during the bankruptcy proceeding's pendency, the Association retained its own counsel and hired an engineering firm to perform non-

invasive inspections of several units. (ECF No. 13 at 8-9.) Moreover, the Association participated in the bankruptcy proceeding, filed objection to Kara Homes, Inc. Master Disclosure Statement and to the Global Agreement entered into by the Debtor and a secured creditor. (*Id.* at 9-10.) Although the Court acknowledges the Association's governing board comprised of unit owners was only temporary until a new developer bought the rights to the Development Project, during that temporary period, the Association did in fact have *de facto* transfer in control with the authority and capacity to protect their interests. Accordingly, the Bankruptcy Court correctly ruled the Association had the authority and capacity to initiate a state law action.

**VI.   CONCLUSION**

For the reasons set forth above, Appellant's appeal is **DENIED**. (ECF No. 6.) An appropriate order will follow.

**Date:** August \_\_\_\_, 2018                              */s/ Brian R. Martinotti*
                                                            **HON. BRIAN R. MARTINOTTI**
                                                            **UNITED STATES DISTRICT JUDGE**